**James Arthur NEWBY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–07–00250–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Feb. 5, 2008.

John J. Davis, Angleton, for appellant.

David P. Bosserman, Angleton, for appellee.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and BOYCE.

## OPINION

JOHN S. ANDERSON, Justice.

A jury found appellant, James Arthur Newby, guilty of three counts of sexual assault of a child and assessed punishment at twenty years' confinement in the Texas Department of Criminal Justice, Institutional Division for each count. *See* Tex. Penal Code Ann. § 22.011(a)(2) (Vernon 2003). The court ordered the sentences to run consecutively. In three issues, appellant argues the evidence is factually insufficient to sustain the verdict and the trial court erred in denying two motions for mistrial after the prosecutor made improper arguments.

### FACTUAL AND PROCEDURAL BACKGROUND

During the summer of 2003, R.S. met appellant in Freeport, Texas while swimming with some friends. Appellant approached the group of kids and invited them to go kayaking. R.S. took appellant up on his offer and went kayaking with him. After that day, R.S. began spending a lot of time with appellant. R.S. often helped appellant with tasks such as mowing the lawn, cleaning the garage, or cleaning appellant's truck, and in return, appellant would pay R.S.

In December 2003, R.S. moved from Freeport, Texas to California to live with

his mother. From California, R.S. moved to North Carolina for a short period of time and then moved to Montana. While R.S. was living in Montana, Detective Kipp Tkachyk, an officer with the Flathead County sheriff's office, contacted R.S. regarding appellant. Detective Tkachyk questioned R.S. about his relationship with appellant. Eventually, R.S. made a written statement alleging appellant had sexually assaulted him on multiple occasions. Appellant was subsequently charged with three counts of sexual assault of a child.

During trial, Detective Tkachyk testified he had been contacted by an officer from the Freeport Police Department, and after their conversation, he contacted R.S. to question him about his relationship with appellant. According to Detective Tkachyk, R.S. and his father met with Detective Tkachyk on April 19, and R.S. initially denied any sexual advances by appellant. Detective Tkachyk testified approximately ten minutes after their meeting, R.S. came back to the detective's office and asked if he could write his statement down. R.S. indicated he was uncomfortable with his father in the room, and he would rather write the statement down. On May 4, Detective Tkachyk contacted R.S. and asked if he was still willing to provide a written statement. On May 5, R.S. provided the statement.

R.S. testified the first inappropriate incident occurred the second time appellant took R.S. kayaking. According to R.S., after they were done kayaking, R.S. changed out of his wetsuit in appellant's pickup, and appellant commented that R.S. had a "nice dick." Appellant and R.S. then went back to appellant's house, and appellant asked R.S. if he wanted to watch a movie. R.S. testified appellant put in a pornographic movie, sat next to R.S., and began masturbating. R.S. testified appellant told him he could masturbate with

him, but R.S. felt uncomfortable and did not do it.

R.S. testified a similar incident occurred when he went to appellant's house to see if appellant had any work he could do. Appellant invited R.S. in and offered him a drink. According to R.S., the two started talking and after awhile appellant put in a pornographic movie. R.S. testified appellant again began to masturbate, and then appellant unzipped R.S.'s pants and began "playing" with R.S.

The next incident between R.S. and appellant occurred one afternoon when R.S. went over to visit appellant. R.S. testified appellant once again began playing a pornographic movie and masturbating. R.S. testified appellant asked him if he "wanted a blow job," and R.S. responded "I don't know." According to R.S., appellant got on the floor and stuck his mouth on R.S.'s penis for approximately ten minutes.

R.S. testified to another incident which occurred when R.S. went over to appellant's house to visit. R.S. testified to the same pattern of events, but this time appellant asked R.S. if he wanted "to give [appellant] a blow job." R.S. testified appellant would not stop asking, so R.S. finally gave in and stuck appellant's penis in his mouth.

Last, R.S. testified about an incident which occurred one afternoon when appellant asked if R.S. would give him a full body massage. R.S. testified appellant went into his room, took off all of his clothes, and lay on his bed. According to R.S., appellant next asked R.S. to remove his clothes. R.S. complied and began rubbing appellant's back. R.S. testified appellant was lying on the bed and R.S. was sitting behind him. R.S. testified appellant put some of the baby oil on R.S.'s penis and then pulled him so close R.S.'s penis went inside appellant's anus. R.S. testified after this incident occurred, appellant told R.S. if he tried to turn him in,

the police would not be able to do anything because R.S. had consented.

According to R.S., he was younger than seventeen when he and appellant had a sexual relationship. R.S. testified he lived with his grandmother during the summer of 2003, and he and his grandmother had a good relationship. R.S., however, did not tell his grandmother about appellant's actions because he "didn't think about it" and because appellant told R.S. he had consented. R.S. further testified he did not tell anyone because he did not think anyone would help him and because he was afraid.

On cross-examination, R.S. testified he went to appellant's house over thirty times during the summer of 2003. R.S. testified he knew what was happening was wrong, but he kept going back because he was afraid appellant would come after him if he stopped visiting. When asked by defense counsel if he ever looked at the pictures in appellant's house, R.S. responded he had "seen a few of them, but [he could not] recall what they [were]." R.S. also testified he thought appellant kept his pornographic movies in his living room by the VCR; however, the Freeport Police Department did not find any pornographic videos in appellant's house. R.S. was also unable to recall whether appellant had any significant scars on his body or whether appellant was circumcised. R.S. admitted he told Detective Tkachyk twice that appellant did not make any sexual advances towards him, but he later decided to make a written statement.

Mary Fernen, R.S.'s grandmother, testified R.S. lived with her in Freeport during the summer of 2003. Fernen testified appellant came to her house on many occasions to talk with R.S. and ask if he wanted to do work at appellant's house. Fernen testified appellant would not come in the house, but instead, he would call R.S. to his vehicle. According to Fernen,

R.S. would come back in to tell her he was going to appellant's house, but he often looked as if he did not want to go. Fernen testified R.S. was a good kid, he did not get into trouble at school, and he made good grades. Fernen also testified R.S. was supposed to participate in a school play, but he became depressed and dropped out. Fernen testified this occurred around the time R.S. was involved with appellant.

Mary Lee Stotler testified she worked as the branch manager for the Boys and Girls Club during the summer of 2003. Stotler testified she saw appellant at the Boys and Girls Club two or three times. Stotler further testified appellant approached her about becoming a volunteer for the club, but he became very defensive and angry when she informed appellant about the mandatory background check. Stotler testified she never saw appellant with R.S., but appellant told her R.S. was troubled and having a difficult time. According to Stotler, appellant seemed to indicate he was R.S.'s mentor. Stotler also testified she had seen a photograph of appellant with R.S. and several other boys; however, Stotler was recalled later and testified she had mistaken another boy for R.S.

Appellant did not testify and did not call any witnesses. The jury found appellant guilty of all three counts of sexual assault of a child and assessed punishment at twenty years' confinement in the Texas Department of Criminal Justice, Institutional Division and a $10,000 fine for each count. *See id.* The court ordered the sentences to run consecutively. This appeal followed.

## DISCUSSION

### A. Was the Evidence Factually Insufficient?

In his first issue, appellant argues the evidence was factually insufficient to sus-

tain his conviction because the complaining witness lacked any semblance of credibility.[1] Appellant admits in his brief this point of error is based solely on R.S.'s lack of credibility, and the issue is whether obvious credibility problems alone can serve as the basis for factual insufficiency. Appellant's reasons for R.S.'s lack of credibility include: (1) R.S. could not describe the inside of appellant's house despite having been there more than thirty times; (2) R.S. could not describe any scars on appellant's body; (3) R.S. did not know whether appellant was circumcised despite seeing him naked; (4) R.S. could not explain why he continued to go to appellant's house; (5) R.S. did not make an outcry statement until approached by a detective in Montana several years later; (6) R.S.'s testimony was uncorroborated by both physical and testimonial evidence; (7) R.S. could not keep his dates straight when testifying; and (8) although the jury was informed R.S. was on probation, they were not informed he was on probation for aggravated sexual assault.[2]

### 1. Standard of Review

In a factual sufficiency review, we consider all the evidence in a neutral light.

*Prible v. State*, 175 S.W.3d 724, 730–31 (Tex.Crim.App.2005). The evidence may be factually insufficient in two ways. *Id.* at 731. First, when considered by itself, evidence supporting the verdict may be so weak the verdict is clearly wrong and manifestly unjust. *Id.* Second, where the evidence both supports and contradicts the verdict, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Id.* In conducting a factual sufficiency review, we must employ appropriate deference so that we do not substitute our judgment for that of the fact finder. *Jones v. State*, 944 S.W.2d 642, 648 (Tex. Crim.App.1996). Our analysis must consider the evidence appellant claims is most important in allegedly undermining the jury's verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

### 2. Analysis

■ Appellant argues the State's case at trial was completely dependent on the testimony of R.S. Appellant admits R.S.'s testimony sufficiently covered all of the elements alleged in the indictment; however, appellant argues R.S.'s complete lack of

---

1. As a factual sufficiency review begins with the presumption that the evidence supporting the jury's verdict is legally sufficient, and since appellant challenges only the factual sufficiency of the evidence, he effectively concedes the evidence is legally sufficient to sustain the conviction. *See Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App.1997); *Clewis v. State*, 922 S.W.2d 126, 134 (Tex. Crim.App.1996).

2. We find it necessary to point out that some of appellant's contentions regarding R.S.'s credibility are not true. First, appellant argues R.S. could not describe the inside of appellant's house, which is a misstatement. The record reflects defense counsel asked R.S. if he looked at the pictures in appellant's house, and R.S. stated he had seen a few of them but could not recall what they were. R.S.'s inability to recall certain pic-

tures in appellant's house is very different than R.S. being unable to describe the inside of appellant's house. Second, appellant argues R.S. could not explain why he continued to go to appellant's house; however, R.S. testified on cross-examination he kept going back to appellant's house because he was afraid appellant would come after him if he stopped going. Third, R.S.'s testimony was not completely uncorroborated because R.S.'s grandmother testified R.S. often acted as if he did not want to go to appellant's house, and R.S. became depressed and dropped out of his school play around the time he was involved with appellant. Finally, the jury was not informed why R.S. was on probation because the judge refused to let that information into evidence. Regardless, the issue of a witness's credibility is assigned to the jury. *See Wyatt v. State*, 23 S.W.3d 18, 30 (Tex.Crim.App.2000).

credibility can be the basis of a factual insufficiency claim. Appellant argues R.S.'s lack of credibility makes the verdict "clearly wrong and manifestly unjust." Appellant heavily relies on the 1924 case of *Green v. State* to support his position.[3] *See Green v. State*, 97 Tex.Crim. 52, 260 S.W. 195, 196 (1924). We find *Green* distinguishable from the facts in this case.

In *Green*, the Court of Criminal Appeals held the testimony of the complaining witnesses was so incredible and contrary to human experience, a reversal was required. *Id.* at 196. In *Green*, the State relied solely on the complaining witness's testimony, and the defendant testified on his own behalf and denied the allegations. *Id.* In this case, the Court found the complaining witnesses's account of how the sexual act occurred and the position in which the alleged forcible act took place unbelievable. *Id.* Additionally, the complaining witness did not report the alleged rape until she discovered she was pregnant. *Id.* The Court stated "though the verdict should not be lightly annulled it is our duty to set it aside and order another trial when the evidence viewed in its strongest light from the standpoint of the state, fails to make guilt reasonably certain." *Id.* The Court determined under these facts the conviction could not stand and reversed the case. *Id.*

Several other cases in the 1930s used a similar analysis as *Green*. In each of those cases, like the *Green* case, the Court found the complaining witness's description of how the physical act occurred dubious. *See Ballard v. State*, 136 Tex.Crim. 188, 124 S.W.2d 131, 132–33 (1938) (holding the evidence insufficient because the complaining witnesses's testimony the offense occurred within six yards of her

kitchen while she was standing up and it did not hurt her or cause any soreness or blood flow was too uncertain and unsatisfactory); *Dodson v. State*, 129 Tex.Crim. 151, 83 S.W.2d 992, 993–94 (1935) (holding the evidence insufficient because the position in which the complaining witness placed herself in her testimony was doubtful and medical evidence showed her hymen was not ruptured); *Stevens v. State*, 121 Tex.Crim. 511, 50 S.W.2d 284, 285 (1932) (holding the evidence insufficient because the complaining witnesses's testimony on the manner in which the act of intercourse took place and the testimony of the examining doctor placed great doubt upon the truth of her testimony).

The case at hand is distinguishable from *Green* and cases like it. In this case, appellant does not argue R.S.'s explanation of how the sexual acts occurred is incredible, which appears to be the primary basis for the decisions in *Green, Ballard, Dodson*, and *Stevens. See Green*, 260 S.W. at 196; *Ballard*, 124 S.W.2d at 132–33; *Dodson*, 83 S.W.2d at 993–94; *Stevens*, 50 S.W.2d at 285. Furthermore, more recent decisions have routinely held the jury is the sole judge of the facts, the credibility of the witnesses, and the weight to be given the evidence. *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex.Crim.App.2000); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.-Houston [14th Dist.] 2000, pet. ref'd). The jury may believe or disbelieve all or part of any witness's testimony. *Jones v. State*, 984 S.W.2d 254, 258 (Tex.Crim.App. 1998). Courts give wide latitude to testimony given by child victims of sexual abuse. *See Villalon v. State*, 791 S.W.2d 130, 134 (Tex.Crim.App.1990) (stating we cannot expect a child victim to testify with

---

**3.** Appellant also cites *Watson v. State* in support of his position, but his reliance is misplaced. *See Watson v. State*, 204 S.W.3d 404, 410 (Tex.Crim.App.2006). *Watson* cites to

*Green* and explains its holding only as a historical reference to past factual sufficiency standards.

the same clarity and ability as mature, capable adults). In this case, the jury heard R.S.'s unambiguous testimony describing each of his sexual encounters with appellant. The jury is in the best position to evaluate the credibility of witnesses and the evidence, and we must afford due deference to its determination. *Marshall v. State,* 210 S.W.3d 618, 625 (Tex.Crim.App. 2006). Further, there is no requirement that the victim's testimony be corroborated by medical or physical evidence. *See Garcia v. State,* 563 S.W.2d 925, 928 (Tex. Crim.App.1978) (holding victim's testimony of penetration, standing alone, was sufficient).

We hold the evidence supporting the verdict was not so weak that the verdict was clearly wrong and manifestly unjust. *See Prible,* 175 S.W.3d at 731. Furthermore, the contrary evidence was not strong enough that the beyond-a-reasonable-doubt standard could not have been met. *See id.* Accordingly, we hold the evidence is factually sufficient to support appellant's conviction. *See Guajardo v. State,* 176 S.W.3d 402, 404–05 (Tex.App.-Houston [1st Dist.] 2004, pet. ref'd) (finding the evidence factually sufficient despite appellant's argument that the State's case relied entirely on the testimony of the complaining witness and the complaining witness was not credible). Appellant's first issue is overruled.

## B. Did the Trial Court Err in Denying Appellant's Motions for Mistrial?

In his second and third issues, appellant argues the trial court committed reversible error by denying two motions for mistrial after the prosecutor made improper jury arguments during his closing argument.

First, appellant complains of the following argument by the prosecutor:

> You have got to talk about these disgusting things that happened to [R.S.], and decide if Mr. Newby is guilty. If you think that Mr. Newby is not guilty, I want each of you to be able to walk out of this courtroom, right by [R.S.], and say [R.S.], I don't believe a word you said, because that's what you have to do.

MR. MCGEE: That's incorrect, your Honor. That's mischaracterizing the law and the evidence. They just have to believe that there is a reasonable doubt, not that they don't believe anything that he said.

THE COURT: Sustained.

MR. MCGEE: Ask the jury to be instructed to disregard.

THE COURT: Jury is instructed to disregard.

MR. MCGEE: I am forced to move for a mistrial by the state.

THE COURT: Denied.

According to appellant, this argument was contrary to the jury charge and the applicable law because the jury was not required to totally reject R.S.'s testimony in order to have reasonable doubt. Appellant argues the statement lowered the State's burden of proof and injected an improper consideration into the minds of the jury.

Appellant also complains of the following argument:

> But you know what this is? This is pretty creepy, that after the summertime of 2003, when the defendant did all this stuff to [R.S.], and then, in 2004, when Mary Stotler left the Boys and Girls Club and was going to the Main Street Project is when she remembers this picture, with three other young men that nobody knows who they are. It's not in the evidence before you.

MR. MCGEE: Objection. That's misleading the jury. We know who they are. It's outside the record.

THE COURT: Sustained.

MR. MCGEE: Ask the jury to be instructed to disregard.

THE COURT: All right. The jury is instructed to disregard.

MR. MCGEE: The state has forced me to move for a mistrial.

THE COURT: Denied.

According to appellant, this argument was an attempt by the prosecutor to get the jury to speculate as to other possible victims.

### 1. Standard of Review

 When the trial court sustains an objection and instructs the jury to disregard but denies a motion for mistrial, the issue is whether the trial court abused its discretion by denying the mistrial. *Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim.App.2004). Almost any improper argument may be cured by an instruction to disregard. *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex.Crim.App.1995). A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Hawkins*, 135 S.W.3d at 77.

 The question of whether a mistrial should have been granted when a curative instruction has been given involves most, if not all, of the same considerations that attend a harm analysis. *Id.* Therefore, in cases in which constitutional rights are not implicated, courts employ a multi-factored analysis which seeks to evaluate the effect of the harm on the outcome of the trial. *See id.*; *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App.1998); *Tucker v. State*, 15 S.W.3d 229, 237–38 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). Those factors to be considered in determining whether the trial court abused its discretion in denying a mistrial include: (1) the severity of the misconduct (magnitude of the prejudicial effect); (2) measures adopted to cure the misconduct (efficacy of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct. *See Hawkins*, 135 S.W.3d at 77 (applying the three-factor test to improper arguments during the punishment phase); *Mosley*, 983 S.W.2d at 259; *Tucker*, 15 S.W.3d at 237–38 (applying the *Mosley* factors to determine if improper argument during guilt/innocence phase constituted reversal). We do not find that any constitutional rights were impinged upon by the prosecutor's remarks in this case. *See Tucker*, 15 S.W.3d at 237 (finding the trial court's erroneous ruling regarding improper comments made during jury argument involved nonconstitutional error); *Ortiz v. State*, 999 S.W.2d 600, 605–06 (Tex.App.-Houston [14th Dist.] 1999, no pet.) (finding that trial court's error in overruling the appellant's repeated objections to arguments outside the record constituted nonconstitutional error). We therefore utilize the *Mosley* factors to determine if a mistrial should have been granted.

### 2. Analysis

 With respect to the first factor, we do not find the State's improper arguments were severe. Appellant argues the first improper statement essentially changed the burden of proof by telling the jury it would have to reject R.S.'s testimony outright rather than view it within the legal framework of reasonable doubt. However, the judge properly explained the burden of proof while reading the charge to the jury before closing arguments, the defense counsel properly explained the burden in his final argument, and the jury charge properly explained the standard. In light of these proper explanations, we do not find the improper statement by the prosecutor severe. With regard to the second statement, we find it vague and not severe. *See Geuder v. State*, 76 S.W.3d 133, 138 (Tex.App.-Houston [14th Dist.] 2002), *overruled on other grounds*, 115 S.W.3d 11 (2003) (finding a mistrial not necessary despite the statement "who

knows how many other people defendant has stolen from in other counties" by the prosecutor in the guilt/innocence phase).

Second, we find the curative measure employed by the trial court sufficient. Appellant argues the simple instruction by the court that the "jury is instructed to disregard" is tepid and of limited curative effect. However, when counsel asks for a particular instruction and the trial court accedes to the request by saying "the jury is so instructed," that instruction will in most cases be considered effective to cure the harm from an improper argument. *Hawkins*, 135 S.W.3d at 84. Many other cases have found this language to be a sufficient curative measure. *See Martinez v. State*, 17 S.W.3d 677, 689–90 (Tex.Crim. App.2000); *Geuder*, 76 S.W.3d at 138; *Hamilton v. State*, 818 S.W.2d 880, 882 (Tex.App.-Houston [14th Dist.] 1991, pet. ref'd).

■ Last, we find appellant's conviction was fairly certain, regardless of the prosecutor's improper remarks, considering the unambiguous testimony by R.S.[4] Accordingly, we hold the trial court did not abuse its discretion in finding the prosecutor's improper comments to the jury were not

so prejudicial that expenditures of further time and expense would be wasteful and futile.[5] We overrule appellant's second and third issues.

### CONCLUSION

Having overruled all three of appellant's issues, we affirm the judgment of the trial court.

4. Appellant also argues other comments made by the prosecutor contributed to the error. Appellant argues two statements made by the prosecutor regarding R.S.'s credibility and appellant's failure to testify compounded the error and, therefore, a mistrial was needed. Appellant, however, failed to object to these comments during trial. A defendant's failure to object to a jury argument forfeits his right to complain about the argument on appeal. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim.App.1996) (holding that appellant waived review of his claim that the prosecutor impermissibly commented on appellant's failure to testify during closing argument where no objection was lodged); *see Wead v. State*, 129 S.W.3d 126, 130 (Tex.Crim.App.2004) (holding the court of appeals erred in considering appellant's argument that the prosecutor's comments amounted to a comment on

appellant's failure to testify since appellant made no such argument in the trial court).

5. Appellant also conducts a harm analysis regarding the comments made by the prosecutor and argues the failure to grant a mistrial resulted in harm. A harm analysis is employed only when there is error, and ordinarily, error occurs only when the trial court makes a mistake. *Hawkins*, 135 S.W.3d at 76. Here, the trial court sustained the defense objection and granted the requested information to disregard. *See id.* The only adverse ruling—and thus the only occasion for making a mistake—was the trial court's denial of the motion for mistrial. *See id.* at 76–77. Under those circumstances, the proper issue is whether the refusal to grant the mistrial was an abuse of discretion. *Id.* at 77. Therefore, we will not conduct a harm analysis.